1
2
3
4
5
6
7

8 UNITED STATES DISTRICT COURT

9 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11 TYRONE DOUTHERD,                           No.  2:17-cv-02225-KJM-JDP

12           Plaintiff,

13      v.                                    ORDER

14 DORIS MARIE MONTESDEOCA, The
   Estate of LUCILLE J. SMITH, UNITED
15 PARCEL SERVICE, INC., LIBERTY
   MUTUAL INSURANCE COMPANY, and
16 HARMONY HOME CARE, INC.,

17           Defendants.

18

19            This case arises from a motor vehicle accident plaintiff suffered while at work for

20 his employer, UPS Ground Freight, Inc., and subsequent events related to his employment.  Two

21 motions for summary judgment are before the court.  Defendant UPS Ground Freight, Inc. (sued

22 as United Parcel Service, Inc., hereafter "UPSF") moves for summary judgment as to all of

23 plaintiff Tyrone Doutherd's claims against it.  UPSF Mot., ECF Nos. 123, 123-1.  Plaintiff

24 opposes the motion.  UPSF Opp'n, ECF No. 135.  UPSF replied.  UPSF Reply, ECF No. 144.

25 Defendant Harmony Home Care, Inc. ("Harmony") moves for summary judgment as to plaintiff's

26 claims against it.  Harmony Mot., ECF No. 125; Harmony Mem. P&A, ECF No. 125-1.  Plaintiff

27 opposes.  Doutherd Opp'n, ECF No. 133.  Harmony replied.  Harmony Reply, ECF No. 140.

28 /////

1

1         The court heard oral argument on the motions by video teleconferencing in

2   consideration of the ongoing coronavirus pandemic on July 10, 2020.  Ellen Dove appeared on

3   behalf of plaintiff.  Amanda Griffith appeared on behalf of Harmony Home Care.  Emily

4   Burkhardt Vicente appeared on behalf of UPSF.  Having carefully considered the parties'

5   arguments, the evidence in the record, and the applicable law, the court now GRANTS UPSF's

6   motion and GRANTS IN PART and DENIES IN PART Harmony's motion.

7         Before reciting the facts in detail, the court resolves evidentiary objections and

8   notes the effect of the law of the case.

9       I.     <u>EVIDENTIARY OBJECTIONS</u>

10         The court focuses on UPSF's objections and consider Harmony's objections only

11   when they are material, as many of them are duplicative of USPF's.  To the extent both moving

12   defendants' objections are merely "boilerplate recitations of evidentiary principles or blanket

13   objections without analysis applied to specific items of evidence," the court declines to scrutinize

14   them one-by-one. *See Ramsey v. Siskiyou Hosp. Inc.*, No. 2:14-cv-01908-KJM-CMK, 2016 WL

15   3197557, at *1 (E.D. Cal. June 9, 2016) (citations omitted); *see also Capitol Records, LLC v.*

16   *BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) ("In motions for summary

17   judgment with numerous objections, it is often unnecessary and impractical for a court to

18   methodically scrutinize each objection and give a full analysis of each argument raised." (citation

19   omitted)).

20       A.    <u>Self-Serving Declarations</u>

21         Plaintiff relies chiefly on his own declarations to oppose the motions. Pl.'s Resp.

22   UPSF SUF, ECF No. 136; Doutherd UPSF Decl., ECF No. 134; Pl.'s Resp. Harmony SUF, ECF

23   No. 133-1; Doutherd Harmony Decl., ECF No. 133-2.  Both Harmony and UPSF object that the

24   declarations are self-serving.  UPSF Obj. Pl.'s Decl., ECF No. 143; Harmony Obj. Pl.'s Decl.,

25   ECF No. 142.  This is not per se a bar to their consideration:

26           [D]eclarations are often self-serving, and this is properly so because
        the party submitting it would use the declaration to support his or

27           her position.  Although the source of the evidence may have some
        bearing on its credibility and on the weight it may be given by a

28           trier of fact, the district court may not disregard a piece of evidence

at the summary judgment stage solely based on its self-serving nature.

*Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).  However, the court is empowered to "disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence."  *Id.* (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5, 1061 (9th Cir. 2002).  "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."  *F.T.C. v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

The court's power to disregard conclusory and threadbare self-serving declarations must be weighed against the requirement to draw all reasonable inferences in favor of the nonmoving party at the summary judgment stage.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

In considering plaintiff's declarations, the court disregards plaintiff's conclusions of law unsupported by factual details.  Insofar as he asserts facts, however, the court will not disregard them solely for their self-serving nature, as counseled by *Nigro*, 784 F.3d at 497.  It remains plaintiff's burden in opposing summary judgment to present evidence from which a jury could reasonably render a verdict in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Plaintiff's UPSF declaration recounts his story at a high level of generality, omitting key facts.  This level of generality is not enough to withstand summary judgment.  A reasonable juror would not have a sufficient understanding of the details from such testimony to find for the plaintiff.  While, deficiencies in affidavits offered in opposition to summary judgment may be cured to make them "admissible at trial" and thus competent to oppose,  *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)),  these basic details would have been in plaintiff's personal knowledge and possession at the time and could have been included in his declaration.  "When a party has relevant evidence in his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him."  *Singh v. Gonzales*, 491 F.3d 1019, 1024 (9th Cir. 2007) (quoting *Int'l*

1  *Union, United Auto., Aerospace, and Agric. Implement Workers of Am. (U.A.W.) v. N.L.R.B.*, 459

2  F.2d 1329, 1336 (D.C. Cir. 1972)).  The missing details are not trifles; they are the factual basis

3  for his case.  The court has no obligation to comb the record for a basis of admissibility of his

4  threadbare factual assertions "as if [it were] [a] pig[] sniffing for truffles."  *In re Oracle Sec.*

5  *Litigation*, 627 F.3d 376, 386 (9th Cir. 2010) (citation omitted).

6         Therefore the court cannot consider sworn statements where plaintiff omits key

7  details of events to which he would have been a percipient witness as competent to oppose.  The

8  court does not sustain the objection as to the totality of plaintiff's declaration.  However, the court

9  sustains the objection as to those parts of the declaration that state in a conclusory fashion that

10  events occurred without any detail.

11         B.  <u>Sham Declaration</u>

12         UPSF objects that several portions of plaintiff's declaration are "sham

13  declaration[s]" that contradict his testimony at deposition and should thus be disregarded.   UPSF

14  Obj. Pl.'s Decl. at 2–3, 4, 6, 14, 17, 18–20 (objecting to Doutherd UPSF Decl. ¶¶ 5, 7, 10, 11, 12,

15  15, 18, 34[1], 37, 38; citing *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)).

16  Under *Kennedy*, a nonmoving party's declaration does not create a genuine issue of material fact

17  if it is inconsistent with that party's deposition testimony, when the inconsistency is not based on

18  confusion at the deposition or a lack of material facts at that time.  *Kennedy,* 952 F.2d at 267.

19  The "rule does not automatically dispose of every case in which a contradictory affidavit is

20  introduced to explain portions of earlier deposition testimony."  *Id.* at 266–67.  Instead, the non-

21  moving party "is not precluded from elaborating upon, explaining or clarifying prior testimony

22  elicited by opposing counsel on deposition and minor inconsistencies that result from an honest

23  discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition

24  affidavit."  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 999 (9th Cir. 2009) (citation omitted).

25  Under this rule, the court is required to make a specific factual finding whether the declaration

26  /////

27  _____

28  [1] Plaintiff's declaration contains two consecutive paragraphs numbered 34, an apparent typo.
Doutherd UPSF Decl. at 11.  UPSF objects to them both.

1  offered at summary judgment is truly a contradictory "sham," or whether it is an honest

2  discrepancy based on confusion, mistake or lack of evidence.  *Id.*

3  Plaintiff responds to UPSF's objections by asserting his testimony at deposition

4  was incomplete because defendant's attorneys failed to ask the follow-up questions necessary for

5  a full explanation.  Pl.'s Resp. Obj. Doutherd UPSF Decl. at 2, ECF No. 147.  Furthermore,

6  plaintiff asserts the deposition excerpts are taken out of context.  *Id.*  Plaintiff does not point to or

7  attach specific excerpts to clarify his position in this regard.  If plaintiff will not put the relevant

8  deposition excerpts in context himself, the court has no obligation to comb the record for him.  *In*

9  *re Oracle*, 627 F.3d at 386.

10  Having reviewed the deposition transcripts UPSF points to, the court finds the

11  assertions UPSF objects to in paragraphs 5, 7, 10, 11, 12, 15 and 37 of plaintiff's declaration are

12  directly contradictory to his deposition with no indication of confusion, incomplete context or a

13  lack of knowledge.  In particular, the affidavit's narrative of plaintiff's communications with his

14  dispatcher after the accident and his course of treatment differs materially from his deposition

15  testimony.  At deposition, plaintiff chronologically recounted the events of the day in response to

16  open ended, unambiguous questions, giving him an opportunity to explain the entire situation.

17  *See* UPSF Supp. Vicente Decl. Ex. B at B07-B11, ECF No. 146-2.  Therefore, the court

18  SUSTAINS the "sham declaration" objection to the contradictory portions of these paragraphs of

19  plaintiff's declaration.

20  On the other hand, the court overrules the objection to both paragraphs numbered

21  34 and paragraph 38.  As to the first 34, the question at deposition called for whether plaintiff had

22  trouble attending medical and physical therapy appointments in 2015, not in 2017, as the

23  declaration states.  UPSF Supp. Vicente Decl. Ex. B at B19–B20.  The second 34 relates to

24  plaintiff's allegedly unrepaired and dangerous truck.  Plaintiff testified at deposition to his

25  perception the bumper to his truck was damaged creating a dangerous condition.  UPSF Supp.

26  Vicente Decl. Ex. C at C08–C09, ECF No. 146-3.  His concession that he was not a mechanic is

27  not sufficient to render his percipient observation of the bumper inconsistent with his declaration.

28  Finally, UPSF cites its own undisputed facts for the proposition that paragraph 38 of plaintiff's

declaration, in which he claims to have received write-ups, is a sham.  UPSF Obj. Pl.'s Decl. at 18-19.  The referenced fact, UPSF SUF 32, is irrelevant to write-ups; here as well, the court has no obligation to comb the record to find what counsel truly meant, regardless which party that counsel represents.  *In re Oracle,* 627 F.3d at 386.

### C. Foundation

Plaintiff asserts, only on information and belief, that UPSF did not report the accident to the Department of Transportation or the California Occupational Health and Safety Administration ("CalOSHA").  Doutherd UPSF Decl. ¶ 14.  UPSF objects this assertion lacks foundation, as plaintiff had no responsibility for preparing reports to DOT or OSHA.  In the absence of any information establishing a basis for this assertion, the objection is SUSTAINED.

### D. Relevance

UPSF objects repeatedly to plaintiff's declaration on relevance grounds.  Relevance objections are generally poorly suited for the summary judgment context because relevance objections are necessarily "duplicative of the summary judgment standard itself … [the court] cannot rely on irrelevant facts, and thus relevance objections are redundant." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  The court OVERRULES relevance objections at this stage, without prejudice.

### E. Hearsay

Similarly, hearsay objections are inappropriate at summary judgment; "objections to the *form* in which the evidence is presented are particularly misguided where, as here, they target the non-moving party's evidence." *Burch*, 433 F. Supp. 2d at 1119 (emphasis in original).  Furthermore, many of the hearsay objections to statements made by UPSF employees in the scope of their duties would likely be considered statements by a party opponent.  Fed. R. Evid. 801(d)(2)(A).  The court also will not sustain hearsay objections at this stage; they are OVERRULED without prejudice.

### F. Improper Medical Testimony

The court overrules in part and sustains in part UPSF's objections that plaintiff attempts to offer improper medical expert testimony through his own declaration and his response

to UPSF's statement of facts.  *See* Doutherd UPSF Decl. ¶¶ 10, 30.  Plaintiff testifies throughout that his work restrictions were inaccurate or improper and that he should have been afforded other restrictions.  For example, plaintiff argues "[n]o one is a better witness to his pain, no expert is needed or even useful in this area."  Pl.'s Resp. UPSF'S Obj. Doutherd Decl. at 1, ECF No. 147.  Plaintiff's point is well-taken in the most immediate sense of his descriptions of his own bodily perceptions.  Similarly, he may also competently describe the sensations he felt when working without restrictions, which may be probative of a need for greater work restrictions, accommodations or damages.  Logically, lay individuals experiencing pain when performing certain activities can have a reasonable comprehension of what kind of alteration in behavior can avoid further pain.

Expert testimony is not required to demonstrate a medical condition's effect on a major life activity at summary judgment in ADA and FEHA cases.  *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1058–59 (9th Cir. 2005).  The court can find no authority that what accommodations are necessitated by a disability can only be shown by an expert.  *See, e.g., Donelson v. Providence Health & Servs.-Washington*, 823 F. Supp. 2d 1179, 1190 (E.D. Wash. 2011) ("In the summary judgment context, a court should weigh the risks and alternatives, including possible hardships on the employer, to determine whether a genuine issue of material fact exists as to the reasonableness of the accommodation." (citation omitted)).  Therefore, defendant's testimony as to his perceptions of pain and reasonable accommodations need not be excluded on the basis that he is not an expert.  Defendant's objections on this basis are OVERRULED.

II.      BACKGROUND

A.  Procedural Background

Before this case was reassigned to the undersigned, the prior District Judge decided several issues raised by plaintiff.  The court is not necessarily bound by a prior order of another judge of this court in the same case, if the prior order resolved fewer than all claims among all parties.  Fed. R. Civ. P. 54(b).  However, the law of the case doctrine counsels against reopening or revisiting questions once resolved in ongoing litigation.  *Pyramid Lake Paiute Tribe*

*of Indians v. Hodel*, 882 F.2d 364, 369 n.5 (9th Cir. 1989) (citing 18 Charles Alan Wright &

Arthur R. Miller, *Federal Practice and Procedure* § 4478).  Plaintiff states he objects to and

contests the prior judge's orders, but he has not filed a motion for reconsideration and does not

state a legal basis for overturning them.  This court finds that the prior judge's rulings

circumscribe what the court may now consider in ruling on the pending motions.  Specifically,

because the previous rulings relate to the claims properly before the court, their effect determines

the relevance of certain facts plaintiff claims are at issue, as explained below.

### 1. Liberty Mutual's Motion to Dismiss

The prior judge granted a first motion to dismiss brought by Liberty Mutual

Insurance Co. ("Liberty Mutual"), ECF No. 8, for failure to state a claim.  Order on Liberty

Mutual MTD 1, ECF No. 31.  Liberty Mutual was UPSF'S workers' compensation insurer, and

the judge found plaintiff's claims against it were preempted by the exclusive remedy of the state

Workers' Compensation Act (WCA).  Order on Liberty Mutual MTD 1 at 10.  The judge granted

leave to amend, plaintiff filed his First Amended Complaint ("FAC"), which is not verified,

ECF No. 33, and Liberty Mutual again moved to dismiss on the same grounds, Liberty Mutual

MTD 2, ECF No. 39.  In an order resolving the second motion to dismiss and UPSF'S motion to

strike, ECF No. 36, the judge dismissed Liberty Mutual from the case with prejudice, confirming

his determination that plaintiff's claims against Liberty Mutual were preempted by the exclusive

jurisdiction of the state Workers' Compensation Appeals Board.  March 22, 2019 Order,

ECF No. 96.

### 2. UPSF's Motion to Strike

After plaintiff filed his FAC, UPSF filed a motion to strike portions of the FAC

that went beyond the grant of leave to amend in the prior judge's order on Liberty Mutual's first

motion to dismiss.  Mot. to Strike, ECF No. 36.  Despite the judge's limited grant of leave to

amend "to assert a cause of action against Liberty Mutual that is not barred by the exclusivity

rule," Order on Liberty Mutual MTD 1 at 10, plaintiff added a total of thirty-three paragraphs

comprising three to five additional claims against UPSF.  UPSF moved to strike the additional

material.  Mot. to Strike.  At the time, the close of fact discovery was less than thirty days away

and UPSF had already taken most of its allotted time for plaintiff's deposition.  *Id.* at 7.  The judge struck the additional thirty-three paragraphs of the FAC.  March 22, 2019 Order at 7–9.  He ordered plaintiff to either move for leave to amend or obtain a stipulation to incorporate the stricken material.  *Id.* at 9.

### 3.  Plaintiff's Motion for Leave to Amend

Plaintiff moved for leave to file a second amended complaint containing substantially the same material that had been stricken.  Mot. to Am., ECF No. 101.  The prior judge denied the motion, finding plaintiff was not diligent in seeking to amend the complaint.  Order on Mot. to Am. at 6, ECF No. 122 (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (core inquiry is whether moving party acted diligently prior to filing amendment)).  The judge found the proposed amendment, adding new facts relating to UPSF'S alleged retaliation between the time of plaintiff's last day of work in June 2018 and the close of discovery in December 2018, would prejudice UPSF.  *Id.* at 7.  The judge held plaintiff's proposed amendment "essentially asks the Court to allow him to file a new lawsuit long after discovery has closed."  *Id.*

In light of this procedural background, and seeing no basis in law or equity to depart from the previous decisions of the prior judge, this court will not entertain attempts to litigate issues occurring after June 2018.  The above-referenced paragraphs of the FAC remain stricken.  Facts relating to allegations of ongoing retaliation are not properly before the court and will be disregarded.

### B.  Factual Background

The following narrative is drawn from the undisputed facts.  To the extent the court cites to plaintiff's response to statements of undisputed facts without citing underlying evidence, it is to clarify his arguments rather than for the existence of admissible evidence.  In other words, where the court cites only his responses to statements of undisputed facts, it is to clarify his arguments only.  As noted, this case arises from a motor vehicle accident that occurred in 2015.  Plaintiff was driving a truck in the course of his employment for defendant UPSF when he was hit by a car driven by defendant Doris Montesdeoca.  Because UPSF's motion concerns

plaintiff's employment-related claims against UPSF, the court first reviews the history of his employment.

### 1.   Plaintiff Employed by UPSF

UPSF hired plaintiff as a Pickup and Delivery ("P&D") driver in 2005.  UPSF SUF 1.  As a P&D driver, plaintiff's responsibilities were to pick up, deliver and load freight on a tractor-trailer.  UPSF SUF 3.  His employment was governed by a Collective Bargaining Agreement ("CBA") between UPSF and the International Brotherhood of Teamsters ("IBT").  UPSF SUF 5.  The CBA sets out the driver route-bidding process, grievance process and disciplinary processes, prohibits favoritism and harassment and sets wages, among other terms of employment.  UPSF SUF 6.  Plaintiff has read the CBA and is generally familiar with its provisions.  UPSF SUF 8.

The delivery route assigned a P&D driver depends on the results of a seniority-based bid system, the procedures for which are set out in the CBA.  UPSF SUF 9; Vicente Decl. Ex. E, (Doutherd Depo. Exhibits) No. 3 (CBA), ECF No. 126-9.  Delivery routes are put up for bid every six months.  UPSF SUF 9.  Drivers are given priority in selecting the routes they want based on their position on the seniority list.  UPSF SUF 9-10.  Seniority is generally determined by hire date.  UPSF SUF 11.  At plaintiff's first terminal, SCM,[2] his seniority date was the date of his original hire in 2005.  UPSF SUF 19.

In 2009, UPSF reduced the number of delivery routes available at plaintiff's assigned terminal, SCM.  UPSF SUF 12, 19.  Plaintiff moved to a different terminal, SAC, in order to "follow the freight."  UPSF SUF 12, 19.  Had he not done so, he would have risked being laid off.  UPSF SUF 13.  When he changed terminals, his seniority date was changed from the date of his hire to the date of the transfer as provided by the CBA and it has remained the later date since.  UPSF SUF 14.

Three other drivers also "followed the freight" to plaintiff's new terminal and had their seniority dates changed.  UPSF SUF 15.  These drivers were 32, 48 and 47 years old when

---

[2] The names of the SCM and SAC terminals appear to the court to be abbreviations, but the parties do not explain them.

their seniority dates were changed.  UPSF SUF 16.  Plaintiff was born in 1966 and was thus 43

years old in 2009 when he transferred to the new facility.  UPSF SUF 17.  Plaintiff was one of the

least senior P&D drivers at the SAC facility.[3]  UPSF SUF 18.  Plaintiff testified that when he was

transferred to SAC, "it didn't matter if they used my new or old seniority date 'cause I was on the

bottom.  So it was irrelevant."  UPSF SUF 19.   Plaintiff's age discrimination claim is based on

the change in his seniority in 2009.  UPSF SUF 46.

### 2. August 27, 2015 Motor Vehicle Accident

On August 27, 2015, plaintiff was driving a UPSF Freight-owned truck on his

route when defendant Doris Montesdeoca, driving defendant Lucille Smith's car with Smith in

the front passenger seat, collided with his truck.  Harmony SUF 1; UPSF SUF 20.  Montesdeoca

was employed at that time by Harmony as a part-time caregiver to Smith, for at least twenty hours

per week.  Harmony SUF 5, 6, 9.  Plaintiff was driving southbound on Business 80 when he saw

Montesdeoca fighting with an unidentified male passenger in the back seat of Smith's car, with

Smith in the front seat as plaintiff passed in a different lane.  Doutherd UPSF Decl. ¶ 2.  Plaintiff

averred

> [t]hat car caught up with my truck; the passenger in the back seat
> of the car pulled the driver's hair and turned her head around.  At
> this point, the driver suddenly accelerated, spun around and came
> toward me head on, driving the wrong way on the freeway.  I saw
> an old woman in the front passenger seat with a look of complete
> horror on her face.

*Id.*  The male passenger in the back seat pulled Montesdeoca's hair immediately prior to the

collision.  Harmony SUF 3.  Plaintiff was unable to avoid hitting Smith's car.  Doutherd UPSF

Decl. ¶ 3.  Smith's car came to a stop after hitting plaintiff's truck.  *Id.*  The male assailant in the

back seat opened the door and staggered away.  *Id.*  His identity remains unknown.  Harmony

SUF 2.  Montesdeoca pled no contest to a DUI charge following the incident.  Harmony SUF 4.

/////

/////

---

[3] The UPSF SUF does not clarify whether plaintiff was one of the least senior drivers at the time
of transfer, the time of the accident, or at all relevant times.

### 3. Montesdeoca's Employment

As noted above, at the time of the accident, Montesdeoca was employed by Harmony as a caregiver for Smith, for at least twenty hours per week. Harmony SUF 5. Among Montesdeoca's duties were driving Smith on local errands. Harmony SUF 6, 9. Smith's daughter, Debbie Blucher, avers any driving in the course of Montesdeoca's employment was restricted to the south Sacramento neighborhood of the "Pocket" where Smith lived, "including going to the store, or out to lunch." Debbie Blucher Decl. ¶ 5, ECF No. 125-5. She states, "I do not know what the purpose of the drive was at the time of the August 27, 2015 accident, but it was further away than their normal outings." *Id.* The incident occurred on southbound Business 80, as many as twelve miles from Smith's residence and well outside the "Pocket."[4] Harmony SUF 22.

A predecessor-in-interest and home health care company similar to Harmony, Love at Home, had initially hired Montesdeoca. Harmony SUF 8-9. Montesdeoca had worked as a caregiver for Smith for approximately nine months prior to Harmony's acquisition of Love at Home. Harmony SUF 9. When Harmony acquired Love at Home, its representatives met Smith's family, who reaffirmed they wanted Montesdeoca as Smith's caregiver. Harmony SUF 10.

When Harmony acquired Love at Home, it reviewed Love at Home's hiring policies to confirm those policies conformed to its own. Harmony SUF 12. Harmony's practices include a review of an employee's employment history, criminal background and reference checks. Harmony SUF 11. Harmony reviewed Montesdeoca's employment file and did not identify any "red flags" in her employment or personal history, including any indication of problematic alcohol use or driving under the influence. Harmony SUF 13. Montesdeoca's

---

[4] Harmony's SUF asserts this is "outside of the geographical area for Montesdeoca's contracted for caregiver services," but the underlying declaration (Patrick Philbrick Decl. ¶¶ 9–10, ECF No. 125-4), does not provide a basis for a firm geographical delineation for Montesdeoca's services beyond stating that Montesdeoca's duties were "caring for Ms. Smith within the guidelines recommended by the family members. Among these included driving Ms. Smith around her immediate neighborhood only for errands and social purposes, but nothing outside of that." *Id.* ¶ 9.

employment file showed no negative reports, feedback or disciplinary actions.  Harmony SUF 14.

Harmony never received any complaints regarding Montesdeoca about prior misconduct, alcohol

use or similar incidents.  Harmony SUF 16.  Montesdeoca did not have a criminal record or other

misconduct that would have appeared on a background check at any time until the subject

accident occurred.  Harmony SUF 17.  Smith's family was unaware of Montesdeoca's drinking in

the presence of Smith, Harmony SUF 15, and there was no alcohol in Smith's house at the time

she was being assisted by Montesdeoca, *Id.*

Harmony had a zero-tolerance policy for employees using alcohol while

performing their duties.  Harmony SUF 18.  Harmony provided this policy verbally and in writing

to Montesdeoca during the hiring process.  Harmony SUF 20.  Upon learning of Montesdeoca's

role in the collision, Harmony terminated her employment.  Harmony SUF 23.

### 4.  Medical Consequences of the Accident

Plaintiff notified his dispatcher immediately after the accident.  In response to his

dispatcher's offer to have someone come get him, plaintiff said, "I'm taking Aleve, so right now

it's not critical."  Suppl. Vicente Decl. Ex. B (Suppl. Doutherd Depo. Excerpts) at B11:7-10, ECF

No. 146-2.[5]  Plaintiff took pictures of the damage to the truck's bumper.  UPSF SUF 20.  After

finishing his shift, plaintiff went to UPSF'S approved workers' compensation medical provider,

U.S. Healthworks, but its offices were closed.  Suppl. Doutherd Depo. Excerpts at B11.

The following day, plaintiff visited Kaiser's emergency room.  *Id.* at B13–15.

Because he reported his injury as work-related, the emergency room doctor recommended he go

to the workers' compensation doctor, and he was not admitted.  *Id.*  Plaintiff "went to Kaiser on

[his] own time three different days and filled out paperwork and met with the admissions person

that's in charge of that, and they didn't have any record of me being there because I didn't make a

co-payment."  *Id.* at B14:22-B15:2.

Plaintiff was suffering from pain in his back, neck, knee and shoulders

immediately following the accident.  Doutherd UPSF Decl. ¶ 8.  He avers he suffered pain "on

---

[5] Given the court's evidentiary ruling, this review of the facts disregards plaintiff's contradictory
declaration and relies on his deposition testimony.

1   numerous occasions in the months since the accident. *Id.* ¶ 11.  On September 17, 2015, he went

2   to his first appointment with a medical provider at Sutter Medical Group to begin treatment as

3   part of his workers' compensation claim.  UPSF SUF 21; Suppl. Doutherd Depo. Excerpts at

4   B16.  The treating provider, physician's assistant Rhonda Blankenheim, provided plaintiff with a

5   medical note dated September 17, 2015, specifying a work restriction of "no driving commercial

6   vehicles."  UPSF SUF 21.  She also prescribed plaintiff a course of physical therapy.  Plaintiff

7   asserts he was given "light duty," which was in fact quite strenuous, causing him further injury.

8   Dootherd UPSF Decl. ¶ 8.  He "was required to perform tough manual labor in the terminal and

9   in the yard."  Pl.'s Resp. UPSF SUF 26.  He states "I was in significant pain doing these

10  strenuous [sic] clean up chores and told Jim, Sara, Kurt, Reed, all the dispatchers, I was in

11  significant pain.  Jim repeatedly told me just to 'man up.'"  Dootherd UPSF Decl. ¶ 8.  Plaintiff

12  provided UPSF with similar medical notes prescribing a sole restriction of "no driving

13  commercial vehicles" on September 23, 2015 and October 22, 2015.  UPSF SUF 22.  He never

14  provided any note to his employer stating any restriction other than avoiding driving commercial

15  vehicles.  UPSF SUF 23.  He in fact did not drive commercial vehicles for UPSF between

16  September 17, 2015 and November 5, 2015.  UPSF SUF 26.

17          On November 5, 2015, plaintiff provided a medical note to UPSF stating he could

18  return to work without restrictions.  UPSF SUF 24.  He then returned to work in his prior capacity

19  as a driver.  UPSF SUF 25.  Thereafter plaintiff avers he

20          asked [his] managers and supervisors, mainly Jim Anderson, to
        send me back to the doctor for treatment for the pain in my knee,
21          back, neck and shoulders. […] Rather than allow me to receive
        further medical treatment, terminal manager Jim Anderson began a
22          course of harassment and write ups.  At no time during this period
        was I informed by management of my rights as an injured worker.
23          I was not told the [workers' compensation] claim was submitted
        after the accident or that it was closed in November 2015.
24

25  Dootherd UPSF Decl. ¶ 11.  However, plaintiff conceded at his deposition he knew from a

26  workers' compensation poster in the break room at the terminal he could opt out of treatment by

27  UPSF'S assigned medical providers and see his own doctor.  Suppl. Dootherd Depo. Excerpts at

28  B5.

1         Following his provision to UPSF of the medical note stating he could be returned

2    to full duty, plaintiff did not provide UPSF with another medical note indicating a need for work

3    restrictions or accommodations.  UPSF SUF 27.[6]  Plaintiff did not seek treatment for the accident

4    from his own primary care provider.  UPSF SUF 28.

5         Plaintiff did not contact UPSF's workers' compensation insurer, Liberty Mutual,

6    to request a second opinion on his fitness for return to work.  UPSF SUF 31.[7]  Plaintiff did not

7    request a return to light duty or a restricted work status.  UPSF SUF 32.  Plaintiff asserts the

8    reason he did not request a return to light duty is that light duty was in fact more strenuous than

9    driving a truck.  Pl.'s Resp. UPSF SUF 32.

10        Plaintiff avers in a conclusory fashion UPSF and Liberty Mutual are conspiring to

11   conceal his medical records and obstruct his ability to receive a recovery from other defendants

12   with regard to his motor vehicle claims.  Doutherd UPSF Decl. ¶ 39.  His declaration does not

13   state a basis of knowledge for this contention and the court gives it no weight.

14        In his complaint, plaintiff alleges the pain of his injuries constituted a protected

15   disability.  FAC ¶¶ 29–31.  He supports this contention solely with his own testimony and does

16   not provide any other evidence of record.  He asserts he was not accommodated for failure to

17   provide true light duty, a reasonable route, and a pallet jack.[8]  Id. ¶ 30.  He disputes UPSF's fact,

18   that "[i]f a driver does not have access to their own assigned pallet jack, a driver had access to

19   and can use an available pallet jack or borrow one from a customer."  Pl.'s Resp. UPSF SUF 37.

20   He cites the depositions of James Anderson and the deposition of Sarah Cutshaw for his

21   contention this is not true, but the cited deposition transcripts do not support his position.  Id.

22   (citing Dove Decl. Ex. A (Anderson Depo. Excerpts) at 58:1-65:25; Dove Decl. Ex. B (Cutshaw

23   Depo. Excerpts) at 60:2-63:20, ECF No. 137).  Plaintiff claims to have been denied an assigned

24   pallet jack before January 21, 2015.  UPSF SUF 36.  He ultimately purchased his own pallet jack

25   _____

26   [6] The UPSF SUF notes plaintiff did not provide a note during the period at issue in the case,
which is prior to June 2018, as reflected in the prior district judge's March 22, 2019 Order and
Order on Mot. to Amend.

27   [7] Plaintiff does not dispute this fact but disputes he knew he could seek a second opinion, without
citing to underlying evidence including a relevant portion of his declaration.

28   [8] A pallet jack is an assistive device for lifting pallets.

1   for which he was not reimbursed.  Douthard UPSF Decl. ¶ 32.  When he was without it, he

2   experienced increased neck, knee and shoulder pain.  *Id.*  UPSF ultimately acquired more pallet

3   jacks and provided him one in March 2017.  UPSF SUF 41.

4           Plaintiff asserts his truck was deliberately misloaded in retaliation for reporting

5   ADA and workers' compensation violations.  FAC ¶ 42.  His dispatcher, Sarah Cutshaw, avers

6   she was the one responsible for allocating freight to drivers based on the variable demands of

7   routing.  Cutshaw Decl. ¶ 4, ECF No. 126-2.  Plaintiff does not specify who was responsible for

8   misloading his truck in his declaration.

9           Plaintiff asserts he was subject to racial discrimination, because he was called a

10  "monkey, f**, and ni****" by another driver.  Pl.'s Resp. UPSF SUF 46. Plaintiff cites to the

11  deposition of dispatcher Sarah Cutshaw, Cutshaw Depo. Excerpts at 54:23–56:12, for this fact.

12  As discussed below, Cutshaw did not recount this incident, but an incident in which Montoya

13  called a third driver a ni**** within earshot of plaintiff.  Plaintiff claims racial discrimination by

14  other drivers was ratified by his supervisor, terminal manager Jim Anderson.  *Id.*  Plaintiff asserts

15  he submitted a manifesto to Anderson accusing him of racial discrimination, which is now

16  missing from his personnel file.  *Id.*  At his deposition, Anderson conceded he received a

17  complaint of racial discrimination through an anonymous hotline at the beginning of his tenure at

18  the terminal but he "would never know who – who any complaints would have been from."

19  Anderson Depo. Excerpts at 76:2–13.  But Anderson later referenced receiving such a manifesto:

20  "Again, I'll have to go back to the manifesto that he presented that said, yeah, that I was a racist

21  and a bigot and he thought he was being treated differently."  *Id.* at 84:4–7.

22          Plaintiff alleges UPSF did not accommodate him because it did not provide him

23  with a route that would allow him to make it to medical and physical therapy appointments.  FAC

24  ¶ 34; *see also* Douthard UPSF Decl. ¶ 33.  But he testified at deposition he did not have trouble

25  making it to medical appointments or physical therapy appointments.  Suppl. Douthard Depo.

26  Excerpts at B19–B20.

27          Plaintiff claims that, as an act of retaliation, his truck was not properly repaired,

28  forcing him to drive it with its front bumper dangling dangerously, putting him and the public at

1   risk.  FAC ¶ 38; Doutherd UPSF Decl. ¶ 18.  UPSF asserts the truck had "mere scratches,"

2   Doutherd Depo. Ex. 15 (photos of truck after accident showing scratches but no detachment of

3   bumper), although it may be the bumper detached only later, after the accident.

4         Plaintiff asserts he complained of the failure to repair the bumper, as well as

5   nonpayment of morning prep time wages, failures to adhere to company policy, and failures to

6   provide a half-hour safety check before shifts to "regulatory bodies" and thus believes he has

7   attained whistleblower status.  Doutherd UPSF Decl. ¶ 15.  His declaration does not identify

8   when or to whom he complained, and at his deposition he testified he reported these issues to his

9   supervisor and his Union, but not to any governmental agency.  As discussed above, UPSF's

10  objection that the declaration is self-serving is sustained as to this conclusory statement.  Plaintiff

11  did file a charge with the California Department of Fair Employment and Housing ("DFEH") on

12  April 3, 2017, alleging discrimination and retaliation.  *Id.* ¶ 16.  He filed a second charge with

13  DFEH dated March 28, 2018.  UPSF SUF 45.

14        Plaintiff had a second accident on the job on June 7, 2018.  Doutherd Decl. ¶ 35.

15  As discussed above, this fact is irrelevant to the claims at issue in this suit.

16      III.    LEGAL STANDARD

17        A court will grant summary judgment "if . . . there is no genuine dispute as to any

18  material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

19  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

20  resolved only by a finder of fact because they may reasonably be resolved in favor of either

21  party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

22        The moving party bears the initial burden of showing the district court "that there

23  is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*,

24  477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish

25  that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio*

26  *Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular

27  parts of materials in the record . . .; or show [] that the materials cited do not establish the absence

28  or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

17

support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

A court may consider evidence as long as it is "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "Admissibility at trial" depends not on the evidence's form, but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 324). The party seeking admission of evidence "bears the burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). If the opposing party objects to the proposed evidence, the party seeking admission must direct the district court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle*, 627 F.3d at 385-86. However, courts are sometimes "much more lenient" with the affidavits and documents of the party opposing summary judgment. *Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

The Supreme Court has taken care to note that district courts should act "with caution in granting summary judgment," and have authority to "deny summary judgment in a case where there is reason to believe the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. A trial may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial." *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1507

18

1    (9th Cir. 1995) (quoting *Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)).  This may be

2    the case "even in the absence of a factual dispute."  *Rheumatology Diagnostics Lab., Inc v. Aetna,*

3    *Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D. Cal. June 19, 2015) (quoting *Black*, 22 F.3d

4    at 572); *accord Lind v. United Parcel Serv., Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

5           IV.    HARMONY'S MOTION

6                  Plaintiff's claim against Harmony is consolidated in a single cause of action styled

7    "Motor Vehicle."  FAC ¶¶ 24-25.  However, the language of the allegations against Harmony

8    evince reliance on two entirely separate legal theories:  negligent hiring and supervision, and

9    vicarious liability.  *See id.* ¶ 25 ("While driving Ms. Smith, Montesdeoca was acting within the

10   course and scope of her employment with Harmony Home Care, Inc., who is liable for negligent

11   hiring, negligent monitoring and failure to vet or supervise its employee/contractee properly.").

12   While these separate theories are conflated in the operative complaint, the parties agree both

13   theories are at issue, as clarified at hearing.

14          A.  Negligent Hiring and Supervision

15                 Under California law, an employer who is negligent in the hiring, training,

16   supervising or retaining of an unfit employee who causes harm to another may be held directly

17   liable for the harm caused by the employee.  *Delfino v. Agilent Technologies, Inc.*, 145 Cal. App.

18   4th 790, 815 (2006).  Liability can only be imposed on an employer for the acts of an employee

19   under a negligent hiring or supervision theory if the employer "knew or should have known that

20   hiring the employee created a particular risk or hazard and that particular harm materializes."

21   *Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054 (1996).  "Liability results … not because of

22   the relation of the parties, but because the employer antecedently had reason to believe that an

23   undue risk of harm would exist because of the employment…"  *Phillips v. TLC Plumbing, Inc.*,

24   172 Cal. App. 4th 1133, 1140 (2009) (quoting Restatement (Third) of Agency § 213, cmt. d, p.

25   459–460).

26                 Here, Harmony introduced evidence showing Montesdeoca's background and

27   personnel file transferred to it by Love at Home disclosed nothing suggesting a propensity to

28   drink on the job or engage in other dangerous activity.  In fact, the file did not contain even a

single complaint about Montesdeoca or any prior criminal history.  Harmony's own investigator conducted an independent background check on Montesdeoca in connection with this case.  *See* Kevin Dente Decl. Ex. A, ECF No. 125-3.  His investigation yielded nothing, save the incident itself, tending to show a similar investigation, had it been conducted by Harmony at the time Montesdeoca was rehired after the Love at Home acquisition, would not have put Harmony on notice of a risk.

In response, plaintiff relies on his own declaration to raise questions about the possibility Montesdeoca's personnel file was somehow incomplete, or that the background checks at the time of her hiring or rehiring could have been more exhaustive.  Pl.'s Harmony SUF, ECF No. 133-1; Doutherd Harmony Decl. ¶ 15, ECF No. 133-2.  This declaration is essentially speculative:  "For instance, no liquor in Mrs. Smith's house does not mean she and Doris did not go somewhere that liquor is served or sold.  If it is true no prior complaint about misconduct or alcohol was produced, that does not a [sic] guarantee they did not exist."  Doutherd Harmony Decl. ¶ 15.  The other portions of the declaration are of a piece with this rank speculation.  Plaintiff advances no competent evidence tending to show Harmony was aware of the risk Montesdeoca would drink or drive recklessly on the job.

Plaintiff's declaration does not raise a genuine issue of material fact as to Harmony's knowledge.  It is precisely the kind of raising "metaphysical doubt" the Supreme Court disallowed in *Matsushita,* 475 U.S. at 586.  More is needed here to survive summary judgment.

Plaintiff also raises the issue of whether Harmony failed to comply with its own policy of requiring Montesdeoca to carry an insurance policy that would have covered her when driving Smith's car.  Pl.'s Opp'n to Harmony MSJ at 1.  This argument is irrelevant to the question of negligent hiring or supervision.  Montesdeoca's possible failure to carry insurance was not the cause, actual or proximate, of the collision on August 27, 2015, and in any event no party has advanced any competent evidence either way.  Even if Harmony were negligent in failing to confirm her insurance coverage, the risk engendered by that negligence was not the
/////

20

1   "particular risk or hazard … that materializ[ed]," as required for direct supervisory liability.

2   *Capital Cities*, 50 Cal. App. 4th at 1054.

3          Because plaintiff has not met his burden of opposing summary judgment on this

4   claim with any competent evidence, no reasonable factfinder could find Harmony knew or should

5   have known Montesdeoca would consume alcohol while driving her client's car, causing the

6   accident at issue.  Harmony's motion is GRANTED as to plaintiff's theory of direct liability for

7   Harmony's negligence.

8                  B.  Vicarious Liability

9          The more difficult question is whether, under California law, Montesdeoca was

10  acting in the scope of her employment at the time of the crash, making Harmony vicariously

11  liable.  If she was, Harmony is responsible for her negligence under the theory of *respondeat*

12  *superior*, regardless of whether Harmony itself negligent.  *Baptist v. Robinson*, 143 Cal. App. 4th

13  151, 160 (2006); *see also* Cal. Civ. Code § 2338.  This doctrine imposes liability on an employer

14  for the realization of risks "that may be regarded as typical of or broadly incidental to the

15  enterprise undertaken by the employer."  *Farmers Ins. Group v. Cty. of Santa Clara*, 11 Cal.4th

16  992, 1009 (1995) (internal quotation marks and citation omitted).

17         Where an employee has substantially deviated from the duties of employment, the

18  employer will not be held liable, as the doctrine is not intended to impose strict liability on

19  employers for all torts of an employee during the working day.  *Baptist*, 143 Cal. 4th at 161

20  (citing *Farmers¸* 11 Cal. 4th at 1004).  However, where "the employee is combining his own

21  business with that of his employer, or attending to both at substantially the same time, no nice

22  inquiry will be made as to which business he was actually engaged in at the time of the injury,

23  unless it clearly appears that neither directly nor indirectly could he have been serving his

24  employer."  *Farmers,* 11 Cal. 4th at 1004 (citations omitted).  "The question of scope of

25  employment is ordinarily one of fact for the jury to determine."  *Mary M. v. City of Los Angeles*,

26  54 Cal.3d 202, 221 (1991).

27  /////

28  /////

                                              21

1    Here, Harmony offers the declaration of Smith's daughter, Debbie Blucher, who

2    testifies:

3    Ms. Montesdeoca would take my mother out for drives, including going to the store, or out to lunch.  However, this driving was
     restricted to the "Pocket" area of Sacramento – this was close to my
4    mother's home, and they never traveled very far.  They traveled to
     nearby places that my mother knew because it made her happy.  I
5    do not know what the purpose of the drive was at the time of the
     August 27, 2015 accident, but it was further away than their normal
6    outings.

7

8    Debbie Blucher Decl. ¶ 5.  Montesdeoca's supervisor's testimony accords with this: "[H]er job

9    duties were caring for Ms. Smith within the guidelines recommended by family members.

10   Among these included driving Ms. Smith around her immediate neighborhood only for errands

11   and social purposes, but nothing outside of that."  Philbrick Decl. ¶ 9.

12    Plaintiff contends the fact Montesdeoca was driving Smith's car, with Smith in the

13   passenger seat, is sufficient to create a genuine dispute of fact for the jury.  Here the court agrees.

14   An employer is not liable for travel to and from the work environment, because "the employee is

15   not ordinarily rendering services to the employer while traveling."  *Baptist*, 143 Cal. App. 4th at

16   162.  But this "coming and going rule" does not apply when the employee is engaged in a "special

17   errand" for the benefit of the employer.  *Jeewarat v. Warner Bros. Enter., Inc.*, 177 Cal. App. 4th

18   427, 436 (2009) (citations omitted).  In *Jeewarat,* for instance, employee was engaged in a special

19   errand when he was driving home from the airport in his own car after attending a work-related

20   conference.  *Id.* at 432.  The employer is "liable for torts committed by its employee while

21   traveling to accomplish a special errand because the errand benefits the employer."  *Tognazzini v.*

22   *San Luis Coastal Unif. School Dist.*, 86 Cal. App. 4th 1053, 1057 (2001) (citation omitted).

23    Harmony's declarations establish the ordinary geographical scope of

24   Montesdeoca's driving duties.  But they do not foreclose the possibility that Smith herself had

25   authority to direct Montesdeoca to undertake a "special errand" outside her normal range.  Smith

26   was in the car.  And nothing in the record indicates Montesdeoca would have had access to the car

27   for her own purposes outside the scope of Harmony's business.  Because Montesdeoca was

28   driving her client as a passenger in the passenger's own car, a situation no party asserts would

22

1   have arisen outside of Montesdeoca's duties, a reasonable jury could find Montesdeoca was

2   within the scope of her employment at the time of the incident.

3          For these reasons, the court finds there is a genuine issue of material fact as to

4   Harmony's vicarious liability for its employee Montesdeoca.  Harmony's motion is thus DENIED

5   with respect to this theory incorporated into plaintiff's claim against Harmony.

6          V.      UPSF'S MOTION

7                  A.  Claim Two: Fraud

8          The gravamen of plaintiff's second cause of action, brought against UPSF for

9   fraud, is that UPSF fraudulently withheld information from plaintiff about his right to treatment

10  as an injured worker, failed to disclose how it processed workers compensation claims and

11  misrepresented the status of his workers' compensation claim.  FAC ¶¶ 26–28.

12         To succeed on a claim for fraud under California law, plaintiff must prove 1) a

13  misrepresentation (a false representation, concealment, or nondisclosure); 2) defendant's

14  knowledge of the falsity of the representation; 3) intent to induce reliance; 4) justifiable reliance;

15  and 5) damages.  *Lazar v. Sup. Ct.*, 12 Cal. 4th 631, 638 (1996) (citing 5 Witkin, Summary of

16  Cal. Law Torts § 676 (9th ed. 1988)).

17         UPSF asserts all such claims are preempted by the exclusive remedy of the

18  California workers' compensation system.   UPSF Mot. at 6–7.  As discussed above, the

19  previously-assigned district judge held that Liberty Mutual's role in the alleged plot to defraud

20  plaintiff by undermining his right to workers' compensation was preempted by the WCA.  March

21  22, 2019 Order.   Plaintiff's only response to this argument is the assertion that "the pre-emption

22  assertion is a cop out as everyone knows the WCAB [Worker's Compensation Appeals Board]

23  does not handle or review any type of fraud allegation."  Pl.'s UPSF Opp'n at 2, ECF No. 135.

24  This unsupported assertion is not the law.

25         California's workers' compensation benefits system provides an exclusive remedy

26  for workers injured in the course of their employment.  Cal. Lab. Code § 3602(a).  A suit for the

27  "recovery of compensation, or concerning any right or liability arising out of or incidental thereto

28  . . . shall be instituted before the [Worker's Compensation Appeals Board ("WCAB")] and not

1   elsewhere . . . "  Cal. Lab. Code § 5300(a).  In determining whether a given claim is barred by

2   exclusivity, courts "initially determine whether the alleged injury falls within the scope of the

3   exclusive remedy provisions.  Where the alleged injury is 'collateral to or derivative of' an injury

4   compensable by the exclusive remedies of the WCA, a cause of action predicated on that injury

5   may be subject to the exclusivity bar."  *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund.*,

6   24 Cal. 4th 800, 811 (2001).

7          Here, plaintiff's fraud claim is derivative of plaintiff's collision with Montesdeoca

8   while on the job; the allegations going to the elements of fraud are essentially concerned with the

9   handling of his workers' compensation claim.  No party disputes the workers' compensation

10   claim arose from an injury at work, therefore any dispute about its handling is derivative.  Where

11   a claim is collateral to or derivative of a compensable injury, "then courts consider whether the

12   alleged acts or motives that establish the elements of the cause of action fall outside the risks

13   encompassed within the compensation bargain."  *Id.* at 811-12.

14          The exception to the WCAB's jurisdiction is when the actor, by his or her alleged

15   acts or motives, was "*no longer* acting as an 'employer'"  *Id.* at 820 (emphasis in original).

16   "[O]nly conduct so extreme and outrageous that the defendant in effect stepped out of its role as

17   an insurer precludes the application of workers' compensation exclusivity."  *Id.* (quoting *Marsh*

18   *& McLennan, Inc. v. Sup. Ct.,* 49 Cal. 3d 1, 11 (1989)) (internal quotation marks omitted).  "The

19   compensation bargain cannot encompass conduct, such as sexual and racial discrimination

20   obnoxious to the interests of the state and contrary to public policy and sound morality."

21   *Piscitelli v. Friedenberg*, 87 Cal. App. 4th 953, 987 (2001) (internal quotation marks and citation

22   omitted).  At the same time, "California courts have invariably barred statutory and tort claims

23   alleging that an insurer unreasonably avoided or delayed payment of benefits even though the

24   insurer committed fraud and other misdeeds in the course of doing so."  *Vacanti¸* 24 Cal. 4th at

25   821.  "In adjudicating whether a claim falls within the workers' compensation system, all doubt

26   should be resolved in favor of finding jurisdiction within the workers' compensation system."

27   *Mitchell v. Scott Wetzel Servs., Inc.*, 227 Cal. App. 3d 1474, 1480 (1991).

28   /////

Here, plaintiff's allegations under the heading of fraud cut directly to the ordinary process of claims handling with no reference to discrimination. *See* FAC ¶¶ 26–28. To the extent plaintiff's facts opposing summary judgment could be construed to show racial or other discrimination as a moving force behind the allegedly deficient handling of his claim, those facts are scant. There is no competent evidence plaintiff was in fact called racial epithets. Pl.'s Resp. UPS SUF 46 (asserting he was called a "ni****" by a fellow driver, but citing only to a deposition transcript recounting an incident in which he overheard the epithet used by one driver against a third.). While plaintiff asserts he took pictures of "monkey, f**, and ni****" written on the windshield of his truck and sent them to Kurt Lauer, a supervisor, his citation to the record reads only as follows: "See Doutherd deposition in this regard"; he does not attach any relevant deposition excerpts or exhibits. *Id.* He cites to his supervisor James Anderson's admission at Anderson's deposition that he received plaintiff's manifesto claiming discrimination and racism, but this also is not proof of the truth of plaintiff's allegations. *Id.* In short, while defendants have put forward no information to negate plaintiff's assertions, the standard at summary judgment is the existence of evidence sufficient to obtain a judgment from the factfinder.

Although a reasonable factfinder could have doubts that plaintiff received adequate treatment for his injury itself in the workers' compensation system, nothing in the facts before the court would support a finding that UPSF "stepped out of its role" as plaintiff's employer in handling his workers' compensation claim. One of the risks of the compensation bargain is the risk of pretextual or skewed evaluation by compensation evaluators and providers; but it is not for the court to second guess the compensation bargain itself if the conduct alleged falls within it. Because there is insufficient evidence to support the alleged fraud violated California's fundamental policies against discrimination, the fraud claim does not fall outside the exclusive jurisdiction of the WCAB.

For all these reasons, the exclusivity of California's workers' compensation remedy bars plaintiff's fraud claim. UPSF's motion for summary judgment is GRANTED on this claim.

/////

B. Claim Three: Failure to Accommodate

Plaintiff's third cause of action is for UPSF's alleged failure to accommodate his disability. *See* FAC ¶¶ 29-36. He asserts UPSF failed to provide the reasonable accommodations of light duty, a reasonable route and a pallet jack after the accident. *Id.* ¶ 30. Plaintiff cites both the Americans with Disabilities Act of 1990 ("ADA") and California's Fair Employment and Housing Act ("FEHA"), but his complaint identifies only the ADA as the operative theory. *See id.* ¶ 32 ("Defendant employer's failure to make reasonable accommodation to Plaintiff constitutes a violation of Section 102(b)(5)(A) of the ADA, 42 U.S.C. § 12112(b)(5)(A)."). That said, California courts have relied on federal interpretations of Title VII to interpret analogous provisions of FEHA, which prohibits unlawful discrimination. *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (citing *Clark v. Claremont Univ. Ctr. & Graduate Sch.*, 6 Cal. App. 4th 639, 662 (1992)). Insofar as plaintiff's complaint could be construed to make claims under FEHA, the analysis under FEHA is relevant to his ADA claim as well. Furthermore, California precedent analyzing the FEHA claim is persuasive here.

To prove his case for failure to accommodate under the ADA, plaintiff must show "(1) he is disabled within the meaning of the ADA; (2) he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) he suffered an adverse employment action because of his disability." *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003).

FEHA defines disability more broadly than the ADA. *See Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245, 257–58 (2000). Because of this, a condition which does not rise to the level of a disability under FEHA will not suffice for the ADA. *Cf. Cripe v. City of San Jose*, 261 F. 3d 877, 895 (9th Cir. 2001) (noting definition of disability is broader under FEHA such that failure to meet FEHA standard is *a fortiori* a failure to meet ADA standard). A physical disability under FEHA must limit a major life activity. *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 345 (2008).

An employer cannot be liable for failure to accommodate a disability of which it had no knowledge. *Ludovico v. Kaiser Permanente*, 57 F. Supp. 3d 1176, 1198–99 (N.D. Cal.

2014) (citing *Prilliman v. United Air Lines*, *Inc.*, 53 Cal. App. 4th 935, 954 (1997)).  "While knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts.  Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations" under FEHA and the ADA.  *Avila v. Continental Airlines, Inc.*, 165 Cal. App. 4th 1237, 1248 (2008) (citation omitted).

Plaintiff asserts he was not accommodated because "light duty" in fact did not exist.  Doutherd UPSF Decl. ¶¶ 8-9.  He does not dispute he provided a medical note to UPSF on September 17, 2015, which restricted him only from driving commercial vehicles.  Pl.'s Resp. UPSF SUF 23.  UPSF accommodated that restriction by keeping him from driving commercial vehicles during that time.  *Id.* ¶ 26.  Plaintiff asserts what he understood would be "light duty" was in fact strenuous cleaning labor in the terminal and he told "Jim [Anderson], Sara [Cutshaw], Reed [sic, Reid Roy], all the dispatcher [sic]" he was in significant pain.  Doutherd UPSF Decl. ¶ 8.  He asserts Jim Anderson, his supervisor, told him to "man up."  *Id.*  Plaintiff asserts he "asked his managers and supervisors, mainly Jim Anderson, to send me back to the doctor for treatment for the pain in my knee, back, neck and shoulders."  *Id.* ¶ 11.  Plaintiff has not identified any specific instance in which anyone at USPF told him his accommodation was "light duty."

"An employee cannot demand clairvoyance of his employer."  *King v. United Parcel Service, Inc.*, 152 Cal. App. 4th 426, 443 (2007).  Employers provided medical information stating the employee is fit to work without restrictions are entitled to rely on that information.  *Arteaga*, 163 Cal. App. 4th at 347.  From September to November of 2015, UPSF accommodated the work restriction listed in the medical documentation plaintiff provided.  Plaintiff requested to be sent back to workers' compensation medical providers, but he offers no evidence he asked for greater restriction in his duties.  It appears from the record UPSF fully accommodated plaintiff between September to November of 2015.

On November 5, 2015, plaintiff provided another medical note to UPSF indicating he could return to work without restrictions.  UPSF SUF 24.  He then began performing his ordinary job as a truck driver.  UPSF SUF 25.  At hearing, plaintiff asserted his request for a

1  pallet jack was a request for accommodation.  Nothing in the record shows that he ever

2  communicated the pallet jack's purpose of accommodating his claimed disability to his employer.

3  Furthermore, he agrees his contention is that he was denied an assigned pallet jack before January

4  21, 2015.  *See* Pl.'s Resp. UPSF SUF 36 ("Undisputed, as they had been discriminating against

5  him for a long time.").

6          Defendant says plaintiff did not provide a medical note to his supervisors

7  indicating a need for an accommodation or work restriction after November 2015.  UPSF SUF 27.

8  Plaintiff purports to dispute this fact, citing his own declaration, and saying only: "Disputed, as he

9  could not obtain a medical note, but he needed one."  Pl.'s Resp. UPSF SUF 27.  Despite

10  claiming "[h]e had been told and believed he could only obtain treatment for those injuries from

11  [UPSF's workers' comp provider]," *id.* 28, plaintiff conceded at his deposition he knew he could

12  seek treatment outside the workers' compensation system from a poster in the break room at the

13  terminal.  Suppl. Doutherd Depo. Excerpts at B05.  No evidence shows he raised shoulder, knee

14  or neck pain with his own doctor, that he sought further treatment from Sutter Medical Group or

15  contacted Liberty Mutual for a second opinion on his fitness to return to work.  Pl.'s Resp. UPSF

16  SUF 29-31.

17          Under FEHA, pain alone may constitute a disability, but only if it "interfere[s]

18  with the performance of the job."  *Arteaga*, 163 Cal. App. at 347; *see also Leatherby v. C & H*

19  *Sugar Co., Inc.*, 911 F. Supp. 2d 872, 880 (N.D. Cal. 2012) ("Although pain can be a disability

20  under FEHA, it must actually limit the employee's ability to work").  In a few cases, plaintiffs

21  who experienced pain but were still able to discharge the functions of their job have been held to

22  be disabled.  *See Huck v. Kone, Inc.*, No. 10-1845, 2011 WL 6294466, at *5 (N.D. Cal. Dec. 15,

23  2011) (physician provided note asserting unspecified pain and reduced arm mobility were work-

24  related); *see also Glow v. Union Pac. R.R. Co.*, 652 F. Supp. 2d 1135, 1146 (E.D. Cal. 2009)

25  (plaintiff tendered declaration and evaluation of his treating physician).  In those cases, in contrast

26  to this one, plaintiffs submitted declarations and evaluations from their doctors specifically

27  advising them to stop working into evidence.

28   /////

1          In other cases, plaintiffs who suffered pain but were able to perform their duties

2     were not disabled.  *See, e.g., Keshe v. CVS Pharmacy Inc.*, No. 14-08418, 2016 WL 1367702, at

3     *9 (C.D. Cal. April 5, 2016) (citing *Arteaga*, 163 Cal. App.4th at 345; *Leatherby*, 911 F. Supp. 2d

4     at 880; and *Boudreaux v. J.B. Hunt Transp., Inc.*, No. 14-00720, 2015 WL 4730340, at *2 (E.D.

5     Cal. Aug. 10, 2015)).  In these cases, plaintiffs were able to perform their job duties and put

6     forward no evidence of a medical recommendation to alter those duties.

7          This case is analogous to the latter strain of cases noted in *Keshe*.  Plaintiff asserts

8     he was disabled on an ongoing basis, yet he does not contest he was able to complete the work

9     required during both the September to November 2015 period and the subsequent period.  Nor

10    does he advance any medical evidence whatsoever to support his allegation that his treating

11    medical providers got his diagnosis wrong.  As discussed above, he relies on his own declaration

12    in this regard.  While the declaration is admissible as discussed above, his own testimony is

13    insufficient to create a triable issue of whether pain that did not appear to the employer to

14    interfere with his job duties could constitute a disability.  The absence of any medical expert

15    testimony, medical records or any other such evidence is notable.  "Reliance on medical opinion

16    and an individualized assessment is especially important when the symptoms are subjective and

17    the disease is of a type that varies widely between people." *Leatherby*, 911 F. Supp. 2d at 880

18    (citation omitted).  This makes this case more similar to *Keshe* than *Huck*.  Because there is no

19    evidence beyond plaintiff's conclusory say-so that he should have been afforded greater

20    restrictions, there is no evidence plaintiff was disabled after November 2015.

21          For the foregoing reasons, the court GRANTS defendant's motion as to plaintiff's

22    claim for failure to accommodate.

23                    C.  Claim Four: Discrimination, Harassment and Retaliation

24          Plaintiff's fourth cause of action against UPSF is styled "Employment

25    Discrimination by UPSF Freight/Harassment and Retaliation."  FAC ¶¶ 37–42.  Plaintiff alleges

26    UPSF retaliated against him "based on race, whistleblower activities, and making a civil rights

27    claim.  He suffered retaliation for exercising his rights, reporting a workplace injury, making a

28    Worker's [sic] Compensation claim and for having had an accident in a company vehicle." *Id.*

1   ¶ 38.  Plaintiff cites the ADA, FEHA and 42 U.S.C. § 2000e.  *Id.*  UPSF moves for summary

2   judgment on the retaliation claims, harassment claims, and disability discrimination claim, but has

3   not moved for summary judgment on any race discrimination claim.  *See* UPSF Mot. 15–23.

4          Discrimination, harassment and retaliation are discrete causes of action.  Race

5   discrimination, retaliation and harassment claims may arise under Title VII (42 U.S.C. § 2000e)

6   or FEHA.  Disability discrimination, retaliation and harassment claims may arise under either

7   FEHA or the ADA.

8          1.   Disability Discrimination

9          Under FEHA, plaintiff must first establish a prima facie case by showing (1) he

10   was disabled; (2) he was qualified to do the essential functions of his job with or without

11   reasonable accommodations; and (3) he suffered an adverse employment action because of the

12   disability or perceived disability.  *Wills v. Sup. Ct.*, 195 Cal. App. 4th 143, 159–60 (2011).  The

13   elements are substantially similar under the ADA.  *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d

14   884, 891 (9th Cir. 2001).  Circumstantial evidence is sufficient to show a discriminatory motive.

15   *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 232 (2013).

16          As discussed above, plaintiff has only advanced evidence of a disability between

17   September and November 2015.  Following that time, he vociferously requested to be sent back

18   to a doctor to no avail.  All the while, he continued to discharge his duties without seeking any

19   independent medical evaluation.  While the court assigns some weight to his testimony of pain, it

20   does not, alone, suffice to prove he had a disability at the critical times.  Plaintiff has failed to

21   meet his burden and the court GRANTS the motion as to this claim.

22          2.   Retaliation

23          a.   Disability Retaliation

24          Also as discussed above, plaintiff was accommodated as prescribed by the medical

25   note he provided between September and November 2015, and following that time, there is no

26   evidence he was disabled.  However, under the ADA, an employee's request for accommodation

27   may constitute a protected activity if the employee had a good faith belief he or she was

28   "disabled" and therefore entitled to accommodation.  *Coons v. Sec. of the U.S. Dept. of Treas.*,

1    383 F.3d 879, 887 (9th Cir. 2004).  Requests for disability accommodation are also protected

2    from retaliation under FEHA.  *Moore v. Regents of University of California*, 248 Cal. App. 4th

3    216, 245–46 (2016) (citing Cal. Gov't Code § 12940(m)(2)).  Disability retaliation claims under

4    the ADA are analyzed using the same burden-shifting framework as employed in racial retaliation

5    claims.  *Brown v. City of Tuscon*, 336 F.3d 1181, 1186 (9th Cir. 2003) (approving use of Title VII

6    burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

7    (1973) for ADA claims).  Under both, the employee must first establish a *prima facie* case of

8    retaliation by showing (1) he engaged in an activity protected by statute; (2) he suffered an

9    adverse employment action; and (3) there was a causal link between the two.  *Pardi v. Kaiser*

10    *Found. Hosps.*, 389 F.3d 840, 849 (9th Cir. 2004).  If the employee can make a prima facie case

11    that his protected activity was the basis of an adverse employment decision, the burden shifts to

12    the employer to present legitimate reasons for the adverse employment action.  *Coons*, 383 F.3d

13    at 887 (citations omitted).  If the employer carries this burden, the plaintiff must demonstrate a

14    genuine issue of material fact as to whether the reason advanced by the employer is a pretext to

15    advance beyond the summary judgment stage.  *Id.* (citation omitted).

16           When plaintiff furnished his supervisors with medical notes restricting his ability

17    to drive commercial vehicles, he engaged in a protected act under at least the ADA.  While

18    disputed, plaintiff's assertion he is not currently employed by UPSF is supported by his testimony

19    that he is "not paid a salary and ha[s] not received any pay or back pay at all," but cannot receive

20    unemployment because, to the Employment Development Department, he appears to be

21    employed by UPSF.  Doutherd UPSF Decl. ¶ 20.

22           Plaintiff has failed to show any evidence, circumstantial or direct, however, to

23    meet his burden that his requests for accommodation were the cause of any adverse action.  Even

24    assuming he requested accommodation for his pain, which as discussed above is not a legally

25    protected disability in his case, there is no evidence of a causal connection.  The court GRANTS

26    the motion as to disability retaliation claims.

27    /////

28    /////

1                                    b.   <u>Racial Retaliation</u>

2              Employers may not retaliate against employees who have "opposed any practice

3    made an unlawful employment practice" by Title VII.  42 U.S.C. § 2000e–3(a).  "The elements of

4    a prima facie case of retaliation [under Title VII] are, (1) the employee engaged in a protected

5    activity, (2) she suffered an adverse employment action, and (3) there was a causal link between

6    the protected activity and the adverse employment action."  *Davis v. Team Elec. Co.*, 520 F.3d

7    1080, 1093–94 (9th Cir. 2008) (citation omitted).  The employer's retaliatory motive must be a

8    "but-for" cause of the adverse employment action, not just a motivating factor.  *Univ. of Tex. Sw.*

9    *Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

10             Here, there is insufficient evidence of causation to find a retaliatory motive was a

11   "but-for" cause.  An employee need only reasonably believe that the employer has engaged in an

12   unlawful employment practice when reporting it in order to claim protection from retaliation

13   under Title VII.  *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983) (letter

14   protesting unspecified racism and discrimination in employer's practices is protected opposition

15   activity).  Although a close reading of the deposition of Jim Anderson reveals he did in fact

16   receive a "manifesto" in which he was accused of race discrimination, it is entirely vague as to

17   time and unclear to what events the manifesto referred.  Anderson Depo. Excerpts at 83–84.  In

18   plaintiff's FEHA charges, he neither mentions his race nor any incident of racial discrimination

19   against another.  Doutherd Depo. Exs. 17–20, ECF No. 126–9.

20             Even assuming plaintiff engaged in protected reporting of an unlawful practice

21   under Title VII, there is little evidence of adverse action that remains at issue in the suit, as

22   discussed above, and plaintiff himself contends the retaliation was the result of his reporting ADA

23   and workers' compensation violations.  *See* FAC ¶ 42.  Therefore, there is no evidence that

24   reporting or complaining of any racial discrimination from which a reasonable jury could find a

25   "but-for" cause of any adverse action.  On this record, the motion must be GRANTED as to this

26   theory.

27   /////

28   /////

1          c.   Harassment

2               i.   Racial Harassment

3               It is unlawful under Title VII to create or maintain a racially hostile work

4   environment.  *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 686 (9th Cir. 2017).  To

5   establish a prima facie case of a racially hostile work environment, plaintiff must show (1) he was

6   subjected to verbal or physical conduct because of his race, (2) the conduct was unwelcome, and

7   (3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and

8   create a an abusive working environment.  *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 798 (9th

9   Cir. 2003).  "When the workplace is permeated with discriminatory intimidation, ridicule, and

10  insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment

11  and create an abusive working environment, Title VII is violated."  *Harris v. Forklift Sys., Inc.*

12  510 U.S. 17, 21 (1993).  Causing the employee to take offense based on an isolated comment is

13  not sufficient to create actionable harassment under Title VII.  *Id.* at 22.  However, if the hostile

14  conduct "pollutes the victim's workplace, making it more difficult for [him] to do [his] job, to

15  take pride in [his] work, and to desire to stay on in [his] position," it is sufficiently severe to be

16  actionable.  *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994).

17              Courts make this determination taking account of the totality of the circumstances.

18  *Nichols v. Azteca Rest. Enterprises*, 256 F.3d 864, 872 (9th Cir. 2001).  Discriminatory conduct

19  must be both subjectively and objectively hostile.  *Id.*  In evaluating whether conduct is

20  objectively hostile, the factors to be considered include the "frequency of discriminatory conduct;

21  its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

22  whether it unreasonably interferes with an employee's work performance."  *Id.* (citation omitted).

23  An employer may be held liable either for creating a hostile work environment vicariously

24  through the acts of a supervisory employee, or through negligently failing to correct or prevent

25  discriminatory conduct by an employee.  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1119 (9th

26  Cir. 2004).

27              As with plaintiff's fraud claim as discussed above, plaintiff's assertions of racist

28  behavior in the workplace do not match the evidentiary record.  In his response to UPSF's

1    statement of undisputed facts, plaintiff describes a situation in which a fellow employee, Sam

2    Montoya "use[d] the N word to and about [plaintiff] and others in [plaintiff]'s presence" and

3    performed acts "such as writing 'monkey, f** and N….r' on [plaintiff's] assigned tractor

4    windshield, and banana peels on his access step."  Pl.'s Resp. UPSF SUF 46.  But his citation to

5    evidence for these occurrences consists of dispatcher Sarah Cutshaw's recounting an incident in

6    which managerial employees, including Jim Anderson, had to discipline Montoya for calling a

7    third employee, James Franklin, a "ni****" in plaintiff's presence.  *See* Cutshaw Depo. Excerpts

8    at 54:23–57:17.  This testimony does not serve as evidence plaintiff himself was called the

9    epithet.  While a racially hostile work environment may arise from the use of slurs in the

10   workplace even if plaintiff was not targeted, *McGinest,* 360 F.3d at 1117, there is no competent

11   evidence in the record here beyond this deposition transcript.  Despite plaintiff's claim he took

12   pictures of racially insulting graffiti on his truck and sent them to Kurt Lauer, a supervisory

13   employee, UPSF SUF 70; Pl.'s Resp. UPSF SUF 46, there is no evidence of the photos in the

14   record.  As noted above, Jim Anderson did concede in his deposition that he had received a

15   "manifesto" from plaintiff accusing him of discrimination, but the contents of the manifesto and

16   evidence going to their truth also are missing from the record.

17           Critically, despite plaintiff's arguments in his papers, his sworn declaration is

18   nearly devoid of these allegations.  Legal memoranda and argument are not evidence that can be

19   assigned any weight in support of plaintiff's position.  Fed R. Civ. P. 56(c)(1); *see also British*

20   *Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).  Because plaintiff is necessarily a

21   percipient witness to these alleged acts of discrimination, his own testimony would be competent

22   to raise an issue of fact here, but it is notably absent.  *See Singh*, 491 F.3d at 1024 (discussing

23   presumption of unfavorability arising from party's withholding probative evidence in his

24   possession and control).

25           Plaintiff appears to assert his employment file, which would have contained his

26   report of harassment including photos of his vandalized truck, has been tampered with or altered,

27   in representing, "No manager at UPSF admitted to knowing what happened to plaintiff's reports

28   of racial harassment."  Pl.'s Resp. UPSF SUF 46.  But to the extent the court could possibly

1    interpret this as a claim UPSF engaged in evidence spoliation, it must fail, as plaintiff has the

2    burden of proving the elements of spoliation, and he advances no further argument, let alone

3    evidence, on that point.  *Reinsdorf v. Skechers U.S.A., Inc.*, 296 F.R.D. 604, 626 (C.D. Cal. 2013).

4                            ii.   Disability Harassment

5                The Ninth Circuit has not expressly held hostile work environment claims are

6    actionable under the ADA, but also has not foreclosed the possibility.  *See Wynes v. Kaiser*

7    *Permanente Hosps.*, 936 F. Supp. 2d 1171, 1185 (E.D. Cal. 2013) (discussing *Brown v. City of*

8    *Tuscon*, 336 F.3d 1181, 1190 (9th Cir. 2003)).  In *Wynes*, another judge of this court assumed for

9    purposes of a motion for summary judgment that such a claim is cognizable and analyzed the

10   claim under the elements of the Title VII hostile work environment standard articulated by the

11   Third Circuit.  *Id.* (citing *Walton v. v. Mental Health Ass'n*, 168 F.3d 661, 667 (3d Cir. 1999)).

12   This court does the same.  The elements of an ADA harassment claim require plaintiff to

13   demonstrate (1) he is a qualified individual with a disability; (2) he suffered from unwelcome

14   harassment; (3) the harassment was based on his disability or a request for accommodations;

15   (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment

16   and to create an abusive working environment; and (5) defendants knew or should have known of

17   the harassment and failed to take prompt remedial action.  *Id.*

18                As discussed above, plaintiff has not advanced any evidence beyond his own

19   assertion he suffered pain that he was disabled after November of 2015.  Something more is

20   needed to demonstrate he was a qualified individual with a disability.  Because one would need to

21   be disabled to be discriminated against as such, the court GRANTS UPSF's motion as to this

22   claim.

23                            3.   Claim Five: Violation of ADEA

24                Plaintiff bases his claim for a violation of the Age Discrimination in Employment

25   Act ("ADEA") on "being denied the benefits of seniority in his position."  *See* FAC ¶ 44.  The

26   ADEA requires a person alleging discrimination on the basis of age to file a charge with the

27   Equal Employment Opportunity Commission ("EEOC") within 180 days of the allegedly

28   discriminatory act, 29 U.S.C. § 626(d), or if the state in which the discrimination has occurred has

                                      35

1    its own age discrimination law and enforcement agency, as does California, the claimant must file

2    the charge within 300 days of the allegedly discriminatory act.  *Sanchez v. Pac. Powder Co.*, 147

3    F.3d 1097, 1099 (9th Cir. 1998); *Josephs v. Pac. Bell*, 443 F.3d 1050, 1054 (9th Cir. 2006).  The

4    timely filing of a charge of discrimination with the EEOC is not jurisdictional, but is a

5    requirement like a statute of limitations that is subject to doctrines including waiver, estoppel and

6    equitable tolling.  *Zipes v. TransWorld Airlines, Inc.*, 455 U.S. 385, 393 (1982).  Plaintiff makes

7    no argument and advances no facts supporting the application of these equitable doctrines.

8            Plaintiff's seniority status changed in 2009.  UPSF SUF 46.  He filed his EEOC

9    charge alleging age discrimination on March 30, 2017.  UPSF SUF 44.  Plaintiff claims the

10   change in seniority was part of a continuing violation because he is "presently and currently being

11   discriminated against because of his race, age, whistleblower status, having made a complaint

12   and/or his disability."  UPSF Opp'n at 3.  In responding to UPSF's fact that his age

13   discrimination claim is based on the change in his seniority in 2009, plaintiff responds

14   "Undisputed that was *a part of his age discrimination claim*, but **disputed** the employer has

15   responded to the racial discrimination claim, leaving that complaint at issue."  Pl.'s Resp. UPSF

16   SUF 46 (emphases in original).  Plaintiff may not invoke the continuing violations doctrine by

17   simply conflating all events that followed his change in seniority.  Unlike Title VII, ADEA

18   discrimination claims require that the plaintiff's age is the "but for" cause of the adverse

19   employment action complained of; the ADEA does not authorize "mixed motive" claims, which

20   are possible as discrimination claims under Title VII.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S.

21   167, 175 (2009).  Again, plaintiff alleges only his change in seniority was motivated by age alone.

22   FAC ¶ 44.  To the extent plaintiff alleges events that followed were motivated by factors other

23   than age such as race, they would not be actionable as an ADEA violation in the first place.  The

24   change in seniority is the only discrete discriminatory act of age discrimination at issue.

25           "[D]iscrete discriminatory acts are not actionable if time barred, even when they

26   are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new

27   clock for filing charges alleging that act."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,

28   113 (2002).  Because plaintiff's change in seniority was the sole discrete act he alleges was age-

1    motivated, it is untimely, as the clock began to run in 2009.  This puts the EEOC filing in 2017

2    far beyond the 300 days during which a filing with the EEOC was required.  *See Sanchez*, 147

3    F.3d at 1099.

4              UPSF's motion is GRANTED as to plaintiff's ADEA cause of action.

5                     4.   Claim Seven: "Violation of State Statutes by UPS Freight"

6              Plaintiff's seventh claim is styled "Violation of State Statutes by UPS Freight."

7    The majority of this claim previously has been struck.  March 22, 2019 Order at 7–9.  The

8    remaining portion consists of a portion of a paragraph alleging wage and hour violations, and a

9    claim based on OSHA.

10                            a.   Wage and Hour

11             In what remains of plaintiff's pleading, he alleges UPSF harmed plaintiff "by its

12   violation of the California Labor Code and Wage and Hour laws by overtime assignments

13   unfairly scheduled; overtime forced upon him when he is injured; requiring him to work while

14   injured, and forcing his return to full duty before he was healed[.]"  FAC ¶ 77.  The California

15   wage and hour statements, and their implementing Industrial Welfare Commission regulations,

16   known as "wage orders," specify a range of possible violations, each with discrete elements.

17   Here, the pleading is so uncertain the court is unable to determine what legal theory plaintiff is

18   relying on.  "Simply put, summary judgment is not a procedural second chance to flesh out

19   inadequate pleadings."  *Wasco Prods., Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989, 992

20   (9th Cir. 2006) (citation omitted).  The court has no obligation to do plaintiff's work for him.  To

21   the extent plaintiff alleges a violation stemming from overtime, plaintiff's concession that he was

22   always paid 1.5 times his regular rate for any overtime is fatal.  UPSF SUF 42–43.  Defendant's

23   motion is GRANTED as to any wage and hour claim.

24                            b.   OSHA

25             "Plaintiff alleges his employer has harmed him by its violation of OSHA

26   regulations and put him at risk for injury."  FAC ¶ 78.  There is no private right of action for

27   OSHA violations.  29 U.S.C. § 653(b)(4) ("[n]othing in this chapter shall be construed to …

28   enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or

1    liabilities of employers and employees."); *see also Crane v. Conoco, Inc.*, 41 F.3d 547, 553 (9th

2    Cir. 1994) (noting no private right of action under OSHA).  Plaintiff's purported private claim for

3    OSHA violations is barred as a matter of law.

4        VI.     <u>CONCLUSION</u>

5          For the foregoing reasons, the court GRANTS Harmony Home Health Care's

6    motion as to supervisory liability and DENIES it as to vicarious liability.  The court GRANTS

7    UPSF's motion in full.  Because UPSF did not move for summary judgment on a Title VII race

8    discrimination claim, that claim survives.

9          The court sets a final pretrial conference for December 11, 2020 at 10:00 a.m.,

10    with a joint pretrial statement in compliance with E.D. Local Rule 281 due three weeks prior.  If

11    the parties jointly agree to referral to a court-convened settlement conference with another judge

12    of the court before the pretrial conference, they may request it now, or as soon as possible after

13    receiving this order.

14          IT IS SO ORDERED

15    DATED:  October 13, 2020.

16

17

18                 CHIEF UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28